Horn *v.* $1,950 (et al., Appellants).

Argued November 14, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Charles F. McKenna,* with him *Ernest G. Nassar,* for appellants.

*Darlington Hoopes,* with him *Darlington Hoopes, Jr.,* for appellees.

OPINION PER CURIAM, May 2, 1958:

The order and judgment is affirmed on the able opinion of Judge ERVIN of the Superior Court, which is reported in 184 Pa. Superior Ct. 321, 132 A. 2d 376.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Nothing can be more certain in the economic life of America than that the beginning of each month brings an accounting for the expenses incurred during the preceding month. It is during that first week of the new month that one receives his telephone bill, electric bill, grocery bill, doctor's bill, etc., etc. Each bill invariably covers expenditures made during the preceding month. It cannot apply to outlays for the

current month because neither the supplier nor the recipient knows how much gas will be consumed, how many loaves of bread will be eaten, and how many bottles of milk will be drunk in the month whose pages are still blank. Yet, in spite of the universality of this custom, dictated by the imperious demands of chronology, we have here a fiercely contested lawsuit involving the droll question as to whether a bill submitted on May 6, 1949, applies to the month of April or May, 1949.

On June 10, 1947, the employees of Karl Lieberknecht Company in Laureldale, Berks County, as members of Local 3688, United Steelworkers of America, entered into a two-year contract of employment (dating from May 1, 1947 to May 1, 1949) with the Lieberknecht Company under Articles of Agreement which provides in Article 2, Section 3, that: "The Company shall, on an employee's first payday of each month, deduct from the pay of such employee his union dues of One Dollar and Fifty Cents ($1.50) [later increased to $2.00] or such other amount as may be established in accordance with the Constitution of the International Union. Said deductions shall be made for all employees who have worked at least 40 hours in *the preceding calendar month.*"*

Section 5 of Article 2 directs the Company to pay, by check, the collected dues to the Secretary-Treasurer of the Union, the United Steelworkers of America, with headquarters in Pittsburgh.

It must be as obvious as "Thirty days hath September, April, June and November," that under the language of Section 3, Article 2, the first payday of the month for the employees of Local 3688, after working at least 40 hours in the *preceding calendar month* would be in June, 1947. That first payday could not

---

* Italics throughout, mine.

possibly fall in May because, in that event, the "preceding calendar month" would have to be April and, of course, the contract of employment under consideration did not exist in April. Thus, it is inescapable that the dues for May, 1947, would have to be deducted in June, 1947; the dues for June, 1947, would then be deducted in July, 1947; those for July would be deducted in August; those for August in September; for September in October; for October in November; for November in December; for December, 1947, in January, 1948; for January in February; for February in March; for March in April; and for April in May— both in May, 1948 and May, 1949.

In accordance with this undeviating schedule, Lieberknecht, at the beginning of each month, starting with June, 1947, and continuing through the life of the agreement, collected dues from the pay of each employee for each preceding month to send to the Secretary-Treasurer of the Union in Pittsburgh. On May 6, 1949, the Company deducted the dues for April, 1949, which totalled $1950, and prepared to send a check to cover the amount to the Secretary-Treasurer of the Union. Before, however, the Company could actually mail the check, Edward A. Yoe and five others representing 972 employees, whose dues had been deducted, brought an action of assumpsit in the Court of Common Pleas of Berks County against Lieberknecht for the $1950. The Union brought suit for the same sum. Lieberknecht filed a petition for interpleader, which was granted, and accordingly paid the $1950 into Court. The Union and Yoe et al. interpleaded against the sum. Following an interlocutory proceeding which took the case to the Superior Court, the court of common pleas, after a hearing by Judge HESS sitting as court and jury, adjudicated the conflicting claims in favor of the Union.

The Court found as a fact and as a conclusion of law that the $1950 collected by the Company represented dues collected for April, 1949, and accordingly entered a verdict in favor of the United Steelworkers of America in the sum of $1950. Yoe et al. filed exceptions to the findings of fact, conclusions of law, and verdict, and the exceptions were argued before a court *en banc,* which agreed with the Trial Judge that the $1950 were dues collected for the month of April, 1949, but decided that the Union was not entitled to the money because the check-off authorization terminated on May 1, 1949, simultaneously with the ending of the collective bargaining agreement between the Union and the Company. The Union appealed to the Superior Court which affirmed the decision of the lower court. We granted allocatur and the case was heard by us.

This Court has now affirmed the judgment of the lower Court on the opinion filed by the Superior Court. Since the Majority of this Court has adopted the Superior Court as its own, it therefore acknowledges responsibility for its bad arithmetic, its peculiar logic, and the complete absence of legal authority for the strange proposition it expounds. (The opinion cites not a single case, digest, text book, or provision in the Restatements).

The Majority Opinion says: "The union was not entitled to an additional deduction after the termination of the agreement. It is clear from the evidence that the deductions were made and remitted to the union during each of the 24 months of the term of the agreement, that is, from May 1947 to April 1949 inclusive. The union cannot, by applying the deductions made in one month to the dues for the preceding month, entitle itself to an additional month's deductions for which the contract does not provide."

In concluding that the Union received dues for 24 months, the Majority either was looking at a defective calendar or employed loose arithmetic. Since the Union received its first check in June, 1947, and did not receive any in May, 1949, it should not require considerable mathematical calculation to arrive at the conclusion that the intervening time totals only 23 months and not 24 months. Thus, the Union is not asking for "an additional month's deductions" as the Majority says. What it is claiming, and properly so, is payment for the 24th month of services rendered to Yoe et al. in accordance with the agreements entered into with the Company and with Yoe et al.

Since the contract between the Union and the Company specifically provided that the dues were to be collected the month after the month in which they accrued, it should be as clear as sunlight in mid-June that at the termination of the contract there would have to be one more collection. It was impossible to avoid that last collecting month. To try to avoid that summing-up month would be like the action of the railroad company president who ordered the removal of the last car of each train in order to prevent rear-end collisions.

A labor union, like any other establishment which expends money, must have financial resources if it is to exist and function. Those resources can only come from dues paid by members of the union. In order to be assured of a continuing inflow of potential assets, most unions today have a check-off arrangement with the employer whereby the employer deducts the dues from the wages coming to the employee and pays it to the union. This check-off agreement is inextricably intertwined with the collective bargaining agreement. Since the strength of a union depends largely on the soundness of its treasury, it must be quite ap-

parent that, to the extent that it may be weakened by lack of funds, to that extent it will be less effective in holding firmly the bond between the company and the employees in the latter's discharge of their obligations to the company. It is thus to the best interests of the employer, once it has entered into a contract with a union, to support and respect the check-off in its every phase, as laid down by the compact with the union.

The company in this case, Karl Lieberknecht, Inc., was faithful to its trust and collected the dues accruing for every month from May, 1947 to April, 1949. It was prevented from paying to the Steelworkers Union the dues collected for April, 1949 because of the action of the Court of Common Pleas of Berks County which action was affirmed by the Superior Court and finally by this Court.

The final affirmance by this Court works an injustice because it deprives the Union of money to which it is contractually entitled, not only by explicit contract but even on an implied basis for services rendered. But the decision of this Court does more than take away $1950 from its rightful owner. It sows seeds of demoralization in the field of labor-management relationship. What is to happen to all contracts which read precisely as the one here under consideration? Are all unions to be deprived of that last month's dues? Is any given year, so far as collection of dues is concerned, to be reduced from 12 months to 11 months? And must unions now, in view of this decision, cease offering benefits to their members for that twelfth month?

However, leaving aside the sociological and mechanical complications which this Court's decision envisages, it is my firm conviction that the Majority's action cannot be supported in law, in morals, or in pub-

lic policy. It gives aid and comfort to individuals using the courts to avoid paying honorable debts. It encourages the reckless renunciation of contractual obligations. It runs counter to the provision of the Constitution which prohibits the impairment of contracts.

Even if it were technically correct to be morally wrong, the decision of this Court does not even measure up to technical standards of accepted principles of law because a contract can not possibly cease until its legal obligations have been liquidated. If a landlord authorizes a renting agent to collect the monthly rent on a lease running from January 1, 1956 to December 31, 1956, it is simply a waste of time to argue that the last month's rent would not be collectible in January, 1957 because the lease expired December, 1956. The authority to collect the last month's rent under the lease would naturally extend beyond the final month's rent and for such time as would reasonably be required to make the collection. Common sense is as much a part of every contract as heat is an inevitable concomitant of fire. To insist that the last month's rent would be uncollectible because the collection can only come after the last month of occupancy has been enjoyed is like insisting that the tail of a dog cannot possibly be part of the dog since it follows the dog. Yoe and his associates in this lawsuit signed a check-off authorization wherein, for a consideration, they assigned a certain sum from their wages each month to the parent United Steelworkers of America, a Union of which they were a part. The assignment reads, inter alia, as follows: "Pursuant to this authorization and assignment, please deduct from my pay each month, while I am in employment within the collective bargaining unit in the Company, monthly dues (not to exceed $2.00) . . . as designated by the Inter-

national Secretary-Treasurer of the Union, as my membership dues in said Union.

"The aforesaid membership dues shall be remitted promptly by you to David J. McDonald, or his successor, International Secretary-Treasurer of the United Steelworkers of America, or its successor, 1500 Commonwealth Building, Pittsburgh 22, Pennsylvania.

"This assignment and authorization shall be effective and cannot be cancelled for a period of one (1) year from the date appearing above or until the termination date of the current collective bargaining agreement between the Company and the Union, whichever occurs sooner."

The "termination date of the current collective bargaining agreement between the Company and the Union" was, truly, May 1, 1949, but that does not mean that all obligations incurred prior to May 1, 1949, ceased as of May 1, 1949. The company was made an agent to collect dues for the life of the contract. The life of the contract included April, 1949. It was impossible to pay the men for April until April had lived its 30 days. Thus, by the sheer workings of the inexorable demands of time, the collection could only take place in May. To say that the Company was not required to collect the April dues, once April had run its course is as absurd as saying that the employees should not have been paid in May for the wages earned in April because the contract of employment expired at the end of April. The eaves of a roof overhanging a dwelling house are as much a part of the house as the walls themselves.

Under the contract above cited and quoted from, Lieberknecht was agent for Yoe et al. to collect dues and transmit to the Union, and Yoe et al. are bound by that contract: "It may be stated as a general rule that where the relation of agency legally exists the

principal will, as stated in Section 241, be liable to third persons on all contracts with them made by the agent in his behalf and within the actual or apparent scope of the agency . . ." (3 C.J.S. Sec. 239, p. 162).

The Majority says that the Union is not entitled to the April dues because its contract with the Company expired on May 1, 1949. But how does that affect the debt which Yoe et al. owe the Union? Since when did a debtor gain immunity from his debts because his employment ceased, or because he left a particular community, or perhaps even sailed to another country? Even a man who departs this life is not discharged from the contracts entered into by him during his living days. His estate is called upon to pay all his debts. Why should Yoe et al. be discharged from the amounts they owe the Steelworkers Union for services and benefits received by them from the Union for the month of April, 1949? These services included not only the whole omnibus of advantages accruing to a member of a powerful labor organization (pension, vacation with pay, medical services, etc.) but such specific services as those rendered by the Union in proccessing complaints and grievances, representing them in Workmen's Compensation cases, offering counsel and guidance, etc. Yoe et al. entered into a contract which they should not be allowed to ignore at will.

"Where under the contract a party may terminate it at his option, he is not liable after termination for further transactions thereunder, *but obligations which have already accrued are not affected.*" (13 C.J. 608, Sec. 640)

When Yoe et al. became members of the United Steelworkers of America they agreed to be bound by its constitution, by-laws, and regulations. As was stated by the United States District Court in the case of *Local 1104, Etc. v. Wagner Electric Corp.,* 109 F. Supp. 675,

677: "The constitution and by-laws of an unincorporated association constitute a contract between the members, and between the members and the association. This rule applies to and controls property rights, absent some exceptional circumstance."

Nothing is more integrally a part of the mechanism of the United Steelworkers union operating in behalf of its membership than the check-off arrangement. Every member contracts when he joins the organization to be bound by the check-off. Indeed, it is to his profit to have his dues automatically deducted from his wages, thereby eliminating the possibility that through oversight or mishap his dues might not be paid and he suffer the loss of other benefits, including valuable seniority rights.

The only fact-finding tribunal in this entire litigation, which, of course, was the Court of Common Pleas of Berks County, found that the sum of $1950 was collected from Yoe et al. for the month of April, 1949.

In its adjudication on April 14, 1953, that Court declared: "Finding of Fact No. 16. The said sum of $1950.00 now in the custody of the Court of Common Pleas of Berks County, Pennsylvania, represents dues collected by Karl Lieberknecht, Inc., on the first day in May, 1949; to wit, May 6, 1949, as dues for the month of April, 1949."

In its discussion on the facts the Berks County Court said: "Such conclusion is in accord with all the testimony submitted. Among others, *LeRoy C. Milliken, Secretary-Treasurer of the Employer, testified that the deduction in question was for the month of April, 1949.*"

In its Conclusions of Law, the Berks County Court declared: "Conclusion of Law No. 3. The dues deducted May 6, 1949 *were the dues for the month of April, 1949.*"

Although the court of common pleas later determined that the Union was not entitled to the $1950, it never changed its finding and conclusion of law that the amount of $1950 was the amount of money collected for dues in April, 1949. In its opinion dated November 3, 1955, which spoke for the court en banc, the following statement appears: "The credible evidence relating to the practice of the parties and a logical construction of the contract lead to only one conclusion, i.e., that *the dues in question were dues owing for the month of April, 1949.* In fact, it would appear that counsel for the Employees at the argument did not strongly contend otherwise. We are also satisfied that insofar as the contract between the Union and the Employer is concerned, *the deductions could properly be made on May 6, 1949, after the termination date of the contract.*"

After so positive a factual finding, it is an enigma why the court of common pleas did not award the $1950 to the Union. But, as enigmatic as that action was, it is a mystery secreted in the shrouds of inexplicability as to why this Court, without in any way disputing the findings of the lower court, still concludes that the Union should not have the money which the whole record unequivocally shows it is entitled to.

The decision of this Court allows what is specifically prohibited by Section 175 of the Restatement, Contracts, namely: "An assignor of a right by assignment under seal or for value warrants to the assignee, in the absence of circumstances showing a contrary intention: (a) That he will do nothing to defeat or impair the value of the assignment." The decision of this Court allows Yoe et al., assignors under a contractual obligation, to defeat the value of their voluntarily-made assignment.

And then, even if, arguendo, the Company should not have collected the dues for April, 1949, it is incontrovertible that Yoe et al. owed the Union $1950 for their April, 1949 dues, and, therefore, the Union is the legal owner of the $1950 in dispute. Thus, the only possible question which could arise would be whether the Union should receive the $1950 through the medium of the collecting Company. But the money is no longer in the possession of the Company. The money is in Court under interpleader proceedings, and the object of such a proceeding is to *ascertain the true owner of the money being held by the Court.* Since, in all the litigation revolving around the $1950 there has been no adjudication other than that the $1950 belongs to the Union, it is simply incomprehensible to me under what authority the Court turns the money over to Yoe et al. who have no more right to it than the most covetous stranger would have to somebody else's money in a bank, upon which he looks with an avaricious eye.

I dissent from Abington to Zelienople.